**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| O'GRADY, *et al.*, | ) | |
| | ) | Case No. 1:25-CV-14656 |
| Plaintiffs, | ) | |
| | ) | Hon. Andrea R. Wood |
| v. | ) | |
| | ) | Hon. Mag. Laura K. McNally |
| HASTINGS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |

**PLAINTIFFS' CONSOLIDATED RESPONSE
TO DEFENDANTS' MOTIONS TO DISMISS**

Plaintiffs, by and through their attorneys, respectfully respond to Defendants' Motions to

Dismiss, Dkt. 28, 30, and 33, as follows:

**INTRODUCTION**

The Complaint describes a disturbing conspiracy, in which government officials

associated with a powerful political dynasty used their offices and those of their fellow

conspirators to stifle a rival political party. The acts they took, from interfering in the political

party registration process to using police presence to thwart a caucus, offend the most basic

constitutional guarantees that preserve fairness in the political process.

The government official Defendants now argue that their conduct described in the

Complaint somehow falls short of government action and therefore, they cannot be held liable

under Section 1983. The arguments are both factually untrue and substantively improper on a

motion to dismiss. Under the properly construed allegations of the Complaint, Defendants used

their own official powers and also conspired with other officials who used theirs (for example, a

police officer who intimidated caucus voters and a Clerk who used her powers to thwart the

registration process).  Under very well-established law, Defendants' conduct pleaded in the Complaint is more than ample to subject them to liability and justifies moving past the pleadings stage.

The Court should deny the motions in their entirety for the reasons that follow.

## BACKGROUND

As is more fully laid out in the 26-page Complaint, Plaintiffs bring ten claims predicated on 176 paragraphs alleging Defendants' conspiracy to abuse their power as elected officials to violate Plaintiffs' constitutional rights, along with violations under state law. Dkt. 1 (Complaint).

Defendant Cindy Murray, along with Defendants Senator Michael Hastings, Mayor Kyle Hastings, and Trustee Kyle Hastings II, are members of the Orland Township United Party ("OTU Party"), rivals of Plaintiffs' OTT Party. Dkt. 1 ¶¶ 1-2, 7-15. Defendants' conspiracy began when Murray, the Clerk of Orland Township, abused her position by intentionally withholding notice of the deadline for Plaintiffs to enter the April 2025 consolidated election, cutting off this avenue of participation. *Id.* ¶¶ 25-29. When Plaintiffs decided to hold a legal caucus instead, Defendants continued their elaborate, government-funded scheme to cut off yet another legal avenue for Plaintiffs to exercise their rights. *Id.* ¶¶ 29-32, 47-96.

At the heart of their conspiracy was Defendants' abuse of power, imbued by their state authority. Defendants deployed a uniformed police officer, an as-yet unnamed Defendant, who served as the Defendant-Mayor's bodyguard and intimidator during their misconduct at caucus. Dkt. 1 ¶¶ 12-13, 80-81. The Defendant-Senator used the resources at his disposal by spending government funds on a transport van to bring a mob to the venue, along with a professional videographer to record his stark abuse of power. *Id.* ¶¶ 50-54. Defendants' tactics were numerous and calculated, ranging from standing in the way of the entrance and ignoring Plaintiffs' requests that they participate in the required check-in process, to outright refusal and screaming verbal

2

insults. *Id.* ¶¶ 48-49. Defendants screamed, shoved, and tried to break into the caucus room. *Id.* ¶¶ 83-89. After police were called to the scene, the Senator, touting his position, falsely told officers it was actually a government-sponsored event. *Id.* ¶ 75. Because a senator was telling them this was a government event, the police were forced to investigate his claims by speaking with the venue owner. *Id.* ¶ 76. The owner confirmed that this was, in fact, a political event, and only then did the police tell the Senator he and his mob had to leave. *Id.* ¶ 77.

The Senator—along with other Defendants—then focused on other forms of disruption. For example, Defendants and their mob stood outside in the parking lot, produced a megaphone and loudspeaker, and, as caucusgoers arrived, told them the caucus was actually *outside*, not inside. Dkt. 1 ¶¶ 57, 93-94. Defendants presented sham affidavits to the caucusgoers, purporting to support Plaintiffs' OTT party, to divert citizens from entering the venue. *Id.* ¶¶ 58, 95. As Defendants stirred chaos, confusion, and violence both inside and outside the caucus venue, they continuously came back to one message: they were the ones in power, and they would not let Plaintiffs take it away. Dkt. 1 ¶¶ 21-22, 55-96. Although Plaintiffs were able to complete the caucus, the unrest was ongoing, turnout was low, and Defendants had succeeded in preventing many attendees from making it into the caucus site. Dkt. 1 ¶ 96. Defendants' conspiracy had substantially interfered with Plaintiffs' event.

And the horror was not over. Defendants continued their conspiracy by manipulating paperwork and processes with the election board itself. Dkt. 1 ¶¶ 99-100. Specifically, Defendant-Mayor Hastings used a government employee, his special assistant, to notarize a fraudulent slate of candidates posing as Plaintiffs' OTT party. *Id.* ¶ 101. Defendant-Trustee Hastings—along with the Senator and the Mayor—had enlisted individuals to make up this fraudulent slate, which they filed as a way of blocking Plaintiffs' slate from the process. *Id.* ¶ 91,

99-102. This caused Plaintiffs to have to object to the fraudulent slate and go before the electoral board. *Id*. ¶¶ 102-03. The board saw through Defendants' scheme, however, and found that their slate was "concerning and fraudulent." *Id*. ¶¶ 103-05. As if that was not enough, Defendants also had members of their own OTU Party file an objection to Plaintiffs' *legally* nominated slate, an effort that was summarily rejected by the electoral board. *Id*. at ¶¶ 106-107. Weeks later, the Senator made knowingly false, defamatory statements to the Chicago Tribune about Plaintiff O'Grady's event, smearing his reputation as the longstanding, trusted Orland Township Supervisor, falsely claiming O'Grady had "circumvented election laws." *Id*. ¶ 108.

Not only did Plaintiffs suffer immense mental and physical distress and financial losses as a result of Defendants' abuses of power, but Plaintiffs Odeh, Lynch, and Feldner did not prevail in the April 2025 election. Dkt. 1 ¶¶ 110, 112-14.

## LEGAL STANDARD

When deciding a motion to dismiss, the Court must accept the facts in the complaint as true and grant Plaintiffs all reasonable inferences that can be drawn from those facts. *Taha v. Int'l Bhd. Of Teamsters*, Local 781, 947 F.3d 464, 469 (7th Cir. 2020). The Rules permit notice pleading and require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Plaintiffs are not required to make "detailed factual allegations" at this stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, dismissal for failure to state a claim under Rule 12(b)(6) is warranted only if "the allegations in the complaint, however true, could not raise a claim of entitlement to relief." *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). The Court's role at this stage is not to determine whether Plaintiffs' account will ultimately hold up:

> "Plausibility" . . . does not imply that the district court should decide whose version to
> believe, or which version is more likely than not. . . . [T]he Court is saying instead that
> the plaintiff must give enough details about the subject-matter of the case to present a

story that holds together. In other words, the court will ask itself could these things have happened, not did they happen.

*Swanson v. Citibank*, *N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). If there are disputed legal issues on claims that will not change the scope of discovery, the Court may elect to defer resolution on those disputes until a later stage of the case. *See*, *e.g.*, *Bergholz v. John Marshall Law Sch.*, No. 18 C 3, 2018 WL 5622052, at *4 (N.D. Ill. Oct. 30, 2018) ("Resolving this legal question will not change the scope of discovery . . . so this aspect of [the motion to dismiss] is denied without prejudice to renewal at summary judgment or prior to trial.")

"[I]n opposing a Rule 12(b)(6) motion," a plaintiff "may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (collecting cases).

**ARGUMENT**

**I.      Plaintiffs Allege Plausible Federal Claims Under 42 U.S.C. § 1983**

To survive a motion to dismiss, a § 1983 action must allege that defendants' conduct was (1) under the color of state law and (2) deprived plaintiffs "of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, (1981) (overruled on other grounds).

The Complaint alleges three federal claims, including First Amendment Retaliation (Count I), Conspiracy (Count II), and *Monell* (Count III). Dkt. 1 ¶¶ 115-35. Defendants' primary argument for dismissal of the federal claims is that Plaintiffs have not met the color of state law or "state action" requirement. Dkt. 29 at 5-10; Dkt. 31 at 6-9; Dkt. 34 at 4-8. Defendants use this argument in an attempt to collapse the remaining federal claims. In so doing, Defendants ignore well-pleaded allegations and misconstrue the governing law. Plaintiffs' detailed allegations that

5

the individual Defendants were state actors, combined with their well-pleaded underlying constitutional violations, are more than enough to survive Defendants' motion to dismiss.

### A. Plaintiffs Plausibly Allege that the Elected Official-Defendants Were State Actors Because They Conspired with a Police Officer-Defendant

Defendants' argument that their conduct does not satisfy the § 1983 color of law requirement is fundamentally incorrect. *See* Dkt. 29 at 5-10, Dkt. 31 at 6-9, Dkt. 34 at 4-8. Defendants ignore the clearest way their conduct satisfies the color of law requirement: they conspired to violate Plaintiffs' constitutional rights under the badge of an ultimate state actor, a uniformed police officer.[1]

For a defendant to have acted under the color of law, he must "have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988). In other words, "the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937, 939 (1982). This is a "necessarily fact-bound inquiry[.]" *Lugar*, 457 U.S. at 939; *Baltz v. Will Cnty.*, 609 F. Supp. 992, 997 (N.D. Ill. 1985) (whether state action exists "necessarily depends on the facts of each case").

In determining whether a defendant's conduct can be attributed to the state, courts look to the source of the defendant's power. *Lindke v. Freed*, 601 U.S. 187, 200 (2024). This power may come from the law itself ("statute, ordinance, regulation") or from a custom or usage. *Id.* (quoting 42 U.S.C. § 1983). An official may have legal authorization to speak on behalf of the state, or he may, through custom or usage, engage in "'persistent practices of state officials' that

---

[1] Plaintiffs are currently undergoing discovery to determine the identity of the officer or officers who participated in the conspiracy. In this Response, Plaintiffs refer to him as a single Defendant Officer.

are 'so permanent and well settled' that they carry 'the force of law.'" *Id.* (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-68 (1970).

To state a claim under §1983 for conspiracy, a plaintiff must allege that there was "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988). It is Defendants, not Plaintiffs, who typically have first-hand knowledge of a conspiracy. *Quinones v. Szorc*, 771 F.2d 289, 291 (7th Cir. 1985) ("The very nature of a conspiracy obscures most, if not all, information about the alleged conspirators' agreement; circumstantial evidence of the conspiracy, particularly regarding the overt acts performed in furtherance of the conspiracy, is all that is ordinarily obtainable before discovery and trial. This is particularly true where, as here, much of the information regarding . . . the formation of the conspiracy [is] in the hands of the defendant."). "The Court cannot demand that [Plaintiffs] also allege what was said at meetings that occurred outside [their] presence." *Salaita v. Kennedy*, 118 F. Supp. 3d 1068, 1085 (N.D. Ill. 2015); *see also Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (holding that voluntary co-conspirators in a common venture are liable and "need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them").

### 1. Plaintiffs Plausibly Allege that the Defendant Officer Was a State Actor

Defendants' motions ignore how the Defendant Officer's role in the conspiracy satisfies the state action requirement. In fact, the only motion to acknowledge the role of the Defendant Officer is the Village Defendants', who briefly, and inaccurately, state that Plaintiffs have made "no allegations" that the Officer "took any action against the Plaintiffs utilizing their position as

7

police officers." Dkt. 29 at 8-9; Dkt. 1 ¶¶ 13, 80-81.[2] This is both a misrepresentation of the Complaint and a flouting of the pleading standards, which require all reasonable inferences from the facts to be drawn in favor of plaintiffs. *Taha*, 947 F.3d at 469.

"The involvement of a state official in . . . a conspiracy plainly provides the state action essential to show a direct violation of [one's constitutional] rights, whether or not the actions of the police were officially authorized, or lawful[.]" *Adickes*, 398 U.S. at 151. Longstanding precedent confirms that a uniformed police officer carrying out his law enforcement duties, while displaying signals of state authority, satisfies the color of law requirement under § 1983. *See, e.g.*, *id.* at 157-58; *Pickrel v. City of Springfield*, *Ill.*, 45 F.3d 1115, 1118-19 (7th Cir. 1995) (denying motion to dismiss and finding sufficient allegations that off-duty officer was acting under color of law, even while he was working for a private company, as he had "signs of state authority" by being in uniform, driving his police car to the restaurant, and wearing his gun); *Greco v. Guss*, 775 F.2d 161, 169 (7th Cir. 1985) ("viewing the evidence in the light most favorable to plaintiffs, the deputy sheriff was on-duty and took an active role in the seizure").

The Village Defendants attempt to rewrite the Complaint by claiming that the "only" allegation regarding the officer is that he drove Defendant-Senator Hastings to a political event. Dkt. 29 at 9. To the contrary, the Complaint alleges that the Defendant Officer "participated in the events described in the Complaint by escorting Defendant-Mayor Hastings in a police vehicle" and "accompanied Defendant-Mayor Hastings *during the events that followed,*

---

[2] Neither the Senator nor Orland Hills Defendants address the Officer as to the "color of law" requirement, and as such, they have forfeited any such argument. *Regas, Frezados & Dallas LLP v. Fed. Deposit Ins. Corp.*, No. 10 C 3420, 2011 WL 332545, at *6 (N.D. Ill. Jan. 28, 2011) (holding that "Defendants forfeited this argument for the purpose of the motion to dismiss by failing to raise it in the opening brief" thereby depriving plaintiff of the opportunity to respond); *Sere v. Bd. of Trustees of Univ. of Illinois*, 852 F.2d 285, 287-88 (7th Cir. 1988) (failing to raise an argument in the brief constitutes forfeiture of the argument).

*including* Defendant-Mayor Hastings' *unconstitutional actions within the caucus venue*"). Dkt. 1 ¶ 13 (emphasis added). By ignoring these allegations, Defendants disregard the requirement that all factual allegations must be accepted as true, along with all reasonable inferences therefrom. *Taha*, 947 F.3d at 469.

As a sworn police officer in the state of Illinois, the Defendant Officer had the authority to act on behalf of the State. Statutorily, he had the duty and the power to arrest "all persons who break the peace or are found violating any municipal ordinance or any criminal law of the State[.]" 65 ILCS 5/11-1-2(a); *see* 625 ILCS 5/11-203 (statutory requirement that citizens exhibit "obedience to police officers" by complying "with any lawful order or direction of any police officer" in the context of directing traffic). Beyond the statutes, a reasonable inference is that the officer also derived his state authority from custom. *See Adickes*, 398 U.S. at 225 ("The power of custom to generate and impose rules of conduct, even without the support of the State, has long been recognized.") He was an officer from neighboring Orland Hills, and although Orland Park Police were already on the scene, no officer attempted to stop him from bodyguarding the Mayor, who had been legally barred from participating in the caucus. Dkt. 1 ¶¶ 69, 80-84.

These allegations support a reasonable inference that the Defendant Officer—who arrived in a police cruiser and stepped out in uniform, armed with his weapon—all the signals of State authority—was acting as a state-sanctioned, armed bodyguard for the Defendant-Mayor during his participation in the conspiracy. Dkt. 1 ¶¶ 13, 75, 80-89; *Pickrel*, 45 F.3d at 1118-19. There is no evidence suggesting the Defendant Officer had crossed state lines or somehow attempted to wield state authority in a federal context. *Cf. Askew v. Bloemker*, 548 F.2d 673, 677 (7th Cir. 1976) (finding no color of law where state officer was participating in a federal raid). His conduct was directly related to his power as a police officer. He used it to facilitate the actions of

9

his co-conspirator, the Mayor, and together, they joined the other Defendants at the event. Dkt. 1 ¶¶ 13, 75, 80-89; *Adickes*, 398 U.S. at 157-58; *Pickrel*, 45 F.3d at 1118-19; *Greco*, 775 F.2d at 169; *Jones*, 856 F.2d at 992. The Defendant Officer was clearly a state actor under § 1983.

### 2. Plaintiffs Plausibly Allege that Defendants Had a Meeting of the Minds with the Unknown Officer Defendant

While disregarding the involvement of this state actor, Defendant-Senator Hastings and the Township Defendants cursorily argue that Plaintiffs have not alleged a meeting of the minds necessary to plead conspiracy. Dkt. 31 at 10; Dkt. 34 at 10-11.[3] But Defendants fail to address how numerous allegations give rise to a reasonable inference that they willfully participated in a joint conspiracy with the Officer Defendant, a state actor. *Adickes*, 398 U.S. at 157-58; *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980) (explaining that Supreme Court precedent holds private actors accountable for willfully participating in joint conspiracy with state actors).

A private party may "act 'under color' of law" in a conspiracy if "he is a willful participant in joint activity with the State or its agents[.]'" *Adickes*, 398 U.S. at 152 (quoting *United States v. Price*, 383 U.S. 787, 794 (1966); *Greco v. Guss*, 775 F.2d 161, 169 (7th Cir. 1985) (finding that individual defendants "jointly and pursuant to a conspiracy with the deputy sheriff to deprive [plaintiffs] of property without due process of law"); *Davis v. Murphy*, 559 F.2d 1098, 1101 (7th Cir. 1977) (rejecting fireman's argument that he was not acting under the color of law because of proof "that he was a willing participant in joint activity with the state agents by acting in concert with the co-defendant policemen. That suffices.").

---

[3] The Village Defendants fail to make any argument on the "meeting of the minds" issue and have therefore forfeited it. Dkt. 29 at 10 (arguing only that Plaintiffs' conspiracy claim fails for lack of state action); *Regas*, 2011 WL 332545, at *6; *Sere*, 852 F.2d at 287-88. Plaintiffs therefore do not further address the sufficiency of their conspiracy claim as to the Mayor or the Trustee.

In *Adickes*, a white teacher sued a store owner whose waitress had refused to serve the teacher while she was with Black students. *Adickes*, 398 U.S. at 148. The teacher alleged that the store owner had conspired with a police officer to violate her constitutional rights because the officer had come into the restaurant, observed the teacher with her students, and refused them service before the officer arrested the teacher. *Id.* at 149-50. The teacher relied "on circumstantial evidence to support her contention that there was an arrangement between [the store owner] and the police." *Id.* at 155-56. Although *Adickes* was a summary judgment case subject to a higher evidentiary burden, the Court's reasoning as to the conspiracy is instructive:

> Petitioner argued that although she had no knowledge of an agreement between Kress and the police, the sequence of events created a substantial enough possibility of a conspiracy [.]
> * * *
> If a policeman were present, we think it would be open to a jury, in light of the sequence that followed, to infer from the circumstances that the policeman and a [store] employee had a "meeting of the minds" and thus reached an understanding that petitioner should be refused service.

*Adickes*, 398 U.S. at 157-58.

Plaintiffs' allegations plausibly support an inference that Defendants participated in a joint conspiracy with the Defendant Officer. *See Jones*, 856 F.2d at 992. The alleged conspiracy began before the caucus, as early as Defendant Murray refused to send notice. Dkt. 1 ¶¶ 15, 25-31.[4] Plaintiffs allege that Murray was acting in concert with the other Defendants—members of the OTU Party seeking to prevent Plaintiffs from entering the election—and her deliberate withholding of notice set in motion the scheme that forced Plaintiffs to organize their own caucus and facilitated Defendants' later interference. *Id.* ¶¶ 2, 11-12, 14–15, 26, 29, 31. The allegations then describe Defendants' coordinated conduct at the venue. *Id.* ¶¶ 49-95. Murray

---

[4] After merits discovery begins, Plaintiffs may discover that the conspiracy began earlier than Defendant Murray's actions described herein. *See* Dkt. 36 (Court's Order staying merits discovery).

was present outside along with other members of the fraudulent slate, where they joined together to create confusion among arriving caucusgoers and distribute sham affidavits. Dkt. 1 ¶ 54, 56-58, 75-76. Most importantly, Plaintiffs allege that the Defendant Officer escorted the Mayor to the venue. *Id*. ¶¶ 13, 80-81. The officer's involvement—viewed within the sequence of events—supports an inference that his participation required prior coordination with Defendants, as the scheme had already been underway. *See Adickes*, 398 U.S. at 157-58.

Under *Adickes* and its progeny, drawing reasonable inferences in Plaintiffs' favor, Defendants' enlistment of the Defendant Officer to escort the Mayor, within the broader course of coordinated conduct described above, plausibly supports an inference that Defendants reached a meeting of the minds to carry out a concerted conspiracy, establishing a nexus to state authority. *Id*.; Dkt. 1 ¶¶ 13, 80-81. No one co-conspirator needs to have been aware of or participated in each action within the conspiracy. *Jones*, 856 F.2d at 992. Because direct evidence of conspiracy is rare and often known only to Defendants themselves, this alleged sequence of events creates a reasonable inference that they were voluntary participants in a common venture, whether or not each Defendant knew of each action taken by the other co-conspirators. *Id*.; *Quinones*, 771 F.2d at 291; *Salaita*, 118 F. Supp. 3d at 1085.

The Court's analysis can end here, as the state action requirement has been satisfied. However, for the reasons below, the Court may independently find sufficient allegations that each elected official-Defendant acted under the color of law.

> **B.      Plaintiffs Plausibly Allege that Each Elected Official-Defendant Was Acting Under the Color of State Law**

All Defendants argue that the Complaint fails to plead that they were state actors under § 1983. Dkt. 29 at 5-10, Dkt. 31 at 6-9, Dkt. 34 at 4-8.

12

Although a defendant's "mere assertion that one is a state officer does not necessarily mean that [he] acts under color of state law[,]" this determination is a rigorous fact-bound inquiry" that demands examination of the entire context. *DiDonato v. Panatera*, 24 F.4th 1156, 1159 (7th Cir. 2022) (discussing cases in which defendants who invoked state authority and had "signs of state authority" were acting under the color of state law).

### 1. Defendant-Clerk Murray Acted Under the Color of State Law

The Township Defendants claim that the Complaint merely alleges "vague and bare conclusions" of Murray's participation in the misconduct alleged. Dkt. 31 at 10.[5] Not so.

Defendant Murray concedes that the state action attributable to her was her refusal to provide notice to Plaintiffs, using her authority as Clerk. Dkt. 31 at 7. The Court's analysis can end here, as Plaintiffs have plausibly alleged that Defendant Murray, in her official role as Clerk, intentionally abused her state power to further this conspiracy. Dkt. 1 ¶¶ 27-29; *TinleySparks, Inc. v. Vill. of Tinley Park*, 181 F. Supp. 3d 548, 560 (N.D. Ill. 2015) (finding that chairperson of public events, appointed by mayor, could not be deemed purely private actor at pleadings stage). Plaintiffs further allege that Defendant Murray's participation in the conspiracy continued throughout the events at the caucus. Dkt. 1 ¶¶ 55-58; *see also* section I.A.2. That is enough to satisfy the color of law requirement. *See Jones*, 856 F.2d at 992.

---

[5] Defendant Murray argues that the claim against her in an official capacity is duplicative of Plaintiffs' claim against the Township to indemnify a judgment. Dkt. 31 at 11. Not so. The official capacity claim asserts that the Township itself owed notice and injured Plaintiffs, acting through Murray as the Township official who provides the notices. The indemnity claim asserts that Murray herself injured Plaintiffs by withholding notice and state statute would require the Township to indemnify a personal judgment. These are distinct, non-duplicative claims with differing elements and may not be dismissed. Kentucky v. Graham, 473 U.S. 159, 166, n. 14 (1985). ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"). *See also Hafer v. Melo*, 502 U.S. 21, 27 (1991) (addressing and dismissing the argument that "officials may not be held liable in their personal capacity for actions they take in their official capacity").

Defendant Murry goes on to impermissibly argue that "Plaintiffs fail to identify the source of this alleged notice requirement[.]" Dkt. 31 at 7. The Court should ignore this contention as an improper twisting of the pleading standard, which requires all well-pleaded allegations to be presumed true. *Taha*, 947 F.3d at 469.; Dkt. 1 ¶¶ 27-29.

Defendant Murray possessed state authority and used it to carry out the alleged constitutional violations described above, under color of state law.

### 2. Defendant-Senator Hastings Acted Under the Color of State Law

Defendant-Senator Hastings ignores the Complaint's fulsome allegations and simply argues that Plaintiffs' use of "on information and belief" is insufficient to show a joint conspiracy. Dkt. 34 at 11. He also blatantly misrepresents the Complaint when he states that "Plaintiffs do not even attempt" to connect his actions with his duties as a Senator. *Id.* at 8. The Senator reluctantly concedes that he has "*some* authority to speak to residents (about legislation)." Dkt. 34 at 5 (emphasis in original). However, he contends he would not be able to "conjure the power of the State through his own efforts." *Id*. (quoting *Mackey v. Rising*, 106 F.4th 552, 556 (6th Cir. 2024)). Applying the law to the actual facts, this argument falls flat.

The Senator downplays his own authority—both statutorily and according to custom and usage—while disregarding numerous allegations in the Complaint that reveal how he did, in fact, rely on his cloak of state authority during the misconduct described in the Complaint. *See West*, 487 U.S. at 49. As an Illinois State Senator representing the 19th district, Senator Hastings serves the people of Orland Hills and Orland Park.[6] The source of his power comes not just from the passage of laws in the assembly, but also from the ambit of his authority to carry out his legislative duties. *See generally* 25 ILCS 115/4 (authorizing expenditures by Illinois Senators to,

---

[6] https://www.senatorhastings.com/19th-district (last visited April 10, 2026)

for example, "pay for 'personal services', 'contractual services', 'commodities,' 'printing', 'travel,' 'operation of automotive equipment,' 'telecommunications services' . . . in connection with his or her legislative duties and not in connection with any political campaign). Under Illinois law, a senator's official functions include not only legislative activity but also publicly funded engagement with constituents within the district. For example, they are authorized to spend public funds in carrying out legislative duties, including maintaining district offices and engaging in constituent services and legislative outreach. *See*, *e.g.*, 25 ILCS 115/6 (authorizing district office and staff expenses); 25 ILCS 115/4 (authorizing reimbursement for expenses incurred in the performance of legislative duties).

To be sure, the Senator's power need not have derived from a statute to constitute state action. It is enough that "custom or usage" cloaked him in State authority. *See Adickes*, 398 U.S. at 168 ("noting that '[s]ettled state practice . . . can establish what is state law. . . Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often and truer law than the dead words of written text'") (quoting *Nashville, C. & St. L.R. Co. v. Browning*, 310 U.S. 362 (1940). A closer look at the factual allegations reveals how custom also imbued the Senator with state authority.

The Senator abused his authority as an elected official by attempting to hijack a political event and turn it into a government (non-private) event. Dkt. 1 ¶¶ 75-76. He used government funds to rent a van and hire a videographer to show up at the caucus site (¶¶ 50-54), and rather than participate (¶¶ 59-60), he began "openly using his title as Illinois State Senator" to take control. *Id.* ¶¶ 61, 75-76. He lied to the Orland Park Police (and caucusgoers in attendance) when he claimed that the event was government-sponsored. *Id.* ¶ 75. His false claim, combined with his proclaimed status as a Senator and all the signals of his authority, caused the police to go to

the venue owner to ask whether the event was indeed government-sponsored. *Id.* ¶¶ 73, 76 ("Given that Defendant-Senator Hastings was an elected official, it was apparent that the police were hesitant to force a dispersal of his mob"). A reasonable inference from these allegations is that, had the Senator been telling the truth, the police would have allowed him to run this government event using the government resources at his disposal. *See* Ill. Const. Art. VIII, § 1(a) ("Public funds, property or credit shall be used only for public purposes."). Further supporting this inference was the police's hesitation to remove the Senator without first confirming whether it was a political or a government event. Dkt. 1 ¶ 67. When they verified that the Senator was lying, only then did the police ask him to leave the venue. *Id.* ¶ 77.

The Senator's claim that he was merely engaging in "private activity" is disingenuous. Dkt. 34 at 7. He was not engaging in merely private conduct. As the Complaint alleges, he overtly and continually refused to participate in the event itself as a private citizen would, including ignoring the rules of the caucus. *See* Dkt. 1 ¶¶ 59-60 (Senator "refused to abide by Plaintiff O'Grady's requests" for them to complete the mandatory check-in process); ¶ 68 (Senator said "he did not care about the check-in process"). There is no indication he was engaging in merely private conduct or in the "ambit of . . . personal pursuits," such as standing outside in pure protest of the event. *Screws v. United States*, 325 U.S. 91, 111 (1945); *cf. Reardon v. Danley*, 74 F.4th 825, 828 (7th Cir. 2023) (finding no state action where plaintiff did *not* allege the defendant, a rival political candidate, had acted in a way that was "related to his position" as an official or even "possessed any state authority" in carrying out the conduct). The Senator spent taxpayer funds in carrying out the conspiracy, overtly relying on his actual and purported state authority. *TinleySparks*, 181 F. Supp. 3d at 556-67; *Teta v. Packard*, 959 F. Supp.

469, 475 (N.D. Ill. 1997) (finding defendant did not act under color of law where there was "no evidence that his status . . . gave [him] any greater authority" to carry out the conduct).

Nor was it the Senator's mere status that gave him this authority. It was his very cloak of state authority as a senator—both statutory, in his power to interact with his constituents and pay for government events, as well as customarily, as a powerful elected official who could hold police on the scene in abeyance—that enabled him to carry out his misconduct.[7] *See Adickes*, 398 U.S. at 167-68 (holding that a custom can have the effect or force of law even where it is not backed by the force of the State); *Screws*, 325 U.S. at 110 (explaining how it is "immaterial that the state officer exceeded the limits of his authority . . . as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State") (citing *Ex parte Commonwealth of Virginia*, 100 U.S. 339, 346 (1879).

The Senator's reliance on *Wilson* does not advance his argument. Dkt. 34 at 7. In *Wilson*, the court held that plaintiffs did not establish state action where they "failed to articulate which of [the defendant-alderman's] actions . . . related to his aldermanic duties." *Wilson v. Price,* 624 F.3d 389, 392 (7th Cir. 2010). The court explained that no other alleged provision expanded his aldermanic powers beyond the legislature. *Id.* at 394 (noting also that "plaintiffs here have made no substantive contention that [the defendant] attempted to cloak himself in his authority as alderman during the confrontation"). This is clearly distinguishable from the instant case, where Plaintiffs have made numerous allegations that Senator Hastings attempted to cloak himself in state authority and that he had the power to do so under statute and custom. Dkt. 1 ¶¶ 50-54, 75-

---

[7] Only merits discovery can reveal the extent of entwinement between the Senator's power through custom and usage to sponsor this supposed "government event."

77. Thus, the Senator both possessed state authority and used it to carry out the alleged constitutional violations.

### 3. Defendant-Mayor and Defendant-Trustee Hastings Acted Under the Color of State Law

The Orland Hills Defendants, which include Defendant-Mayor Hastings and Defendant-Trustee Hastings, similarly argue they were not acting under the color of law. Dkt. 29 at 6-11. In support, they almost exclusively rely on *Lindke v. Freed* as a "roadmap to the dismissal" of Plaintiffs' federal claims. *Id*. at 6. The Court can reject Defendants' argument, as *Lindke* does not control the outcome here for at least three separate reasons. *See Lindke*, 601 U.S. 187.[8]

First, *Lindke* was a summary judgment case, subject to evidentiary burdens inapplicable here at the motion to dismiss stage. *Lindke*, 601 U.S. at 193. Defendants ignore this procedural difference and urge the Court to adopt the same outcome based on an inapposite case. The Court should reject Defendants' improper attempt to impose a heightened pleading standard.

Second, Defendants inflate the *Lindke* holding beyond its precedential value. *Lindke* did not overrule decades of seminal caselaw; rather, it dealt with the unique issue of social media in the context of § 1983 litigation. *See Lindke*, 601 U.S. at 191, 197, 204 (describing the issue as "a public official using social media" and stating that "[t]he nature of the technology matters to the state-action analysis").[9] Defendants are incorrect that *Lindke* dictates the outcome here, where Plaintiffs have alleged Defendants abused their authority as elected officials in a purely offline context. *See generally* Dkt. 1. At most, *Lindke* reinforces the principle that a plaintiff may not

---

[8] The Court can also reject the Village Defendants' and the Senator's reliance on *Lindke* as outcome-determinative for the same reasons discussed herein. *See* Dkt. 34 at 8; Dkt. 31 at 9.

[9] *Lindke* cites to various seminal cases without overruling any of them. *See*, *e.g.*, *Lindke*, 601 U.S. at 195-97 (citing with approval *Lugar*, 457 U.S. 922, *Adickes*, 398 U.S. 144, *Screws*, 325 U.S. 91, and others).

*solely* "hang his hat" on the defendant's "status as a state employee." *Lindke*, 601 U.S. at 197.[10] Plaintiffs have alleged far more than Defendants' mere status as a basis for state action.

Finally, *Lindke* is plainly distinguishable from the facts of this case. In *Lindke*, the plaintiff commented on the defendant's Facebook profile, who was also a city manager. *Lindke*, 601 U.S. at 193. On his profile, the manager regularly posted both personal and job-related updates, and at some point, the plaintiff commented on a post about a city policy. *Id*. When the manager blocked the plaintiff and deleted his comments, the plaintiff argued it was a suppression of speech in a public forum. *Id.* at 192. In finding that the manager was not acting under the color of law, the Court reasoned that the defendant's profile was a "[h]ard-to classify case[]" and noted that "officials too have the right to speak about public affairs in their personal capacities." *Id.* at 203. Most critically, the Court held: "And when there is doubt, additional factors might cast light—for example, an official who uses government staff to make a post will be hard pressed to deny that he was conducting government business." *Id*.

Here, the allegations center on Defendants invoking their power as elected officials to inflict harm during the Plaintiffs' constitutional activities, including spending government funds to do so. *See* Dkt. 1 ¶¶ 1-176. There are no allegations that it was the *Plaintiffs* who sought out the Defendants in their own, semi-private space in order to transform it into a public forum. *Id*. There are no allegations that Defendants were attempting to exercise their own First Amendment rights by, for example, protesting the event directly or even participating in the caucus along with private citizens. *Id*. Rather, the Complaint alleges that Defendants used their official

---

[10] Defendants' reliance on *Mackey v. Rising*, an out-of-circuit case, is misplaced for the same reason. 106 F.4th 552 (6th Cir. 2024). *Mackey* dealt with the issue of a public official's Facebook use, combined with a threatening private phone call. *Id.* at 554-55 (finding that city commissioner's physical threats toward plaintiff through a phone call to plaintiff's mother did not come from any police power and therefore did not constitute state action). These facts are inapposite and should not guide the Court's analysis given that this is a fact-sensitive determination. *See Lugar*, 457 U.S. at 939; *Baltz*, 609 F. Supp. at 997.

authority not only to try to block the caucus itself, but also to attend the event and use public resources to mislead police and interfere with private citizens engaged in protected activity. *Id.*; *cf. Lindke*, 601 U.S. at 196 (explaining that state officials have the right to be off the clock). Put simply, Defendants made no effort to be "off the clock."

As to the Defendant-Mayor's state action, he arranged for uniformed police officer to serve as his bodyguard throughout the misconduct at the venue, Dkt. 1 ¶ 13, 80, and following his attempts to break into the caucus room, he then used his "special assistant, who receives a government salary by the Village of Orland Hills," to "notarize[] both the fraudulent-slate Defendants' affidavits and the OTU-slate Defendants' affidavits." *Id.* ¶ 101. These allegations reveal that the Mayor was able to commission a uniformed officer and utilize a government employee to notarize fraudulent documents, both overt acts in carrying out their conspiracy. *Id.* Presuming these allegations are true and drawing reasonable inferences in Plaintiffs' favor, they have alleged more than enough to demonstrate the Mayor's actual and purported authority. *See Lopez v. Vanderwater*, 620 F.2d 1229, 1236 (7th Cir. 1980) (finding judge who abused his power by trying to prosecute plaintiff was acting under color of law, noting: "[a]ction taken by a state official who is cloaked with official power and who purports to be acting under color of official right is state action . . . whether or not the action is in fact in excess of the authority actually delegated to the official under state law") (citing *Screws*, 325 U.S. 91).

As to Defendant Trustee-Hastings' state action, the Complaint alleges that he was a member of the OTU Party and he—along with the Senator and the Mayor—enlisted a group of individuals "to pose as a fraudulent slate of OTT candidates . . . despite having previously signed petitions to support the OTU Party." Dkt. 1 ¶ 91. This effort "represented an attempt . . . to hijack Plaintiffs' legal OTT Party slate." *Id.* ¶ 92. The fraudulent slate was critical to the greater

20

conspiracy, including the events at the venue, wherein the Senator and others used a loudspeaker to mislead caucusgoers into believing the caucus was in the parking lot and presented them with sham affidavits to support the fraudulent slate. *Id.* ¶ 94. There is no telling whether the Trustee or the Mayor, both of whom organized this fraudulent slate, used government funds to, for example, print and notarize these sham affidavits. Finally, the Complaint alleges that this fraudulent slate—assembled by, among others, the Trustee, was notarized and filed with the election board, forcing Plaintiffs to file objections. *Id.* ¶¶ 99-102. The validity of Plaintiffs' allegations is further bolstered by the election board's order, which found that the papers related to the fake slate were "concerning and fraudulent." *Id.* ¶¶ 103-05. A reasonable inference from these allegations is that the Trustee used his actual and purported authority to perpetrate this misconduct using governmental resources. *TinleySparks*, 181 F. Supp. 3d at 558.

The Court should find that Plaintiffs have more than satisfied federal pleading requirements as to each individual Defendant acting under the color of law, for either of the independent reasons above.

### C.      Plaintiffs Plausibly Allege First Amendment Retaliation

The Orland Hills and Village Defendants offer no substantive First Amendment analysis; rather, they rely solely on their lack of state action argument to defeat Count I. Dkt. 29 at 5-6; Dkt. 31 at 6 (stating the rules for a First Amendment claim and then focusing exclusively on the state action requirement).[11] Plaintiffs incorporate their arguments above in response.

The Senator also focuses on the state action argument while briefly asserting—in a single paragraph—that Plaintiffs have not met the deprivation element of their First Amendment claim

---

[11] Nor does Defendant-Mayor Hastings address the merits of Plaintiffs' § 1983 *Monell* claim. Dkt. 29 at 11. Rather, he argues simply that if the Court dismisses the other federal claims, the *Monell* claim cannot stand. *Id.* As such, the Mayor has forfeited any argument as to the insufficiency of his *Monell* claim beyond the state action requirement. *See Regas*, 2011 WL 332545, at *6; *Sere*, 852 F.2d at 287-88.

because they were able to get onto the ballot. Dkt. 34 at 9.[12] This argument impermissibly narrows what constitutes an actionable First Amendment deprivation.[13]

To state a claim for First Amendment retaliation, a plaintiff must plausibly allege that he (1) engaged in constitutionally protected speech; (2) "suffered a deprivation that would likely deter First Amendment activity in the future" and that (3) such activity was "at least a motivating factor" for the retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).[14] The second element is objective, asking whether "the 'retaliatory activities would deter a person of ordinary firmness from exercising First Amendment activity in the future'" *McDonough v. City of Chicago*, 743 F. Supp. 2d 961, 973 (N.D. Ill. 2010) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 552 (7th Cir. 2009)) (internal quotations omitted).

In *McDonough*, a case in this district, a plaintiff's alleged deprivations survived the higher summary judgment standard when they included "frequent harassment" and being "constantly moved from crew to crew in retaliation" for speaking out against various actions by the City over a number of years. *McDonough,* 743 F. Supp. 2d at 977. In finding a genuine issue of material fact as to the second element of the plaintiff's First Amendment claim, the court noted that "[t]he issue is not whether the *plaintiff* was deterred, but rather whether a reasonable person would be deterred." *Id.* (emphasis added). When defendants argued the plaintiff's

---

[12] Plaintiffs have already provided the Court with two independent bases to reject Defendants' state action argument. See Section I.A.B., above.

[13] The Senator makes no argument that Plaintiffs' allegations are insufficient under the first or third elements of a First Amendment claim, and as such, he has forfeited them. *Regas*, 2011 WL 332545, at *6; *Sere*, 852 F.2d at 287-88.

[14] Count I is labeled First Amendment Retaliation. Dkt. 1 p. 16. However, Plaintiffs have more than sufficiently pleaded allegations to support a First Amendment claim based on retaliation or chilling. *See* Dkt. 1 ¶¶ 23-72; 115-12; *Surita v. Hyde*, 665 F.3d 860, 877 (7th Cir. 2011) ("Retaliation claims and chilling claims are related in that the Constitution protects citizens from penalties that follow protected speech (retaliation) and threats of penalties for future protected speech (chilling)."). *Hernandez v. Illinois Inst. of Tech.*, 63 F.4th 661, 668 (7th Cir. 2023) (noting FRCP "do not require a plaintiff to plead legal theories"); *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam); *Bartholet v. Reishauer A.G. (Zürich)*, 953 F.2d 1073, 1078 (7th Cir. 1992).

deprivations were "trivial," the court further explained that, putting aside the factual dispute regarding the trivial nature of plaintiff's deprivations, "even if this harassment was 'trivial in detail,' it may nevertheless have been 'substantial in gross.'" *Id.* at 973-74 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982); *see also Surita v. Hyde*, 665 F.3d 860, 879 (7th Cir. 2011) ("The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable."); *Bridges v. Gilbert*, 557 F.3d 541, 552 (7th Cir. 2009) (holding that a prisoner sufficiently alleged retaliation where he was harassed by guards after submitting an affidavit in support of a fellow inmate's lawsuit, and noting that "[e]ven though some of these allegations would likely not be actionable in and of themselves, if the acts were taken in retaliation for the exercise of a constitutionally protected right, then they are actionable under § 1983").

In arguing that Plaintiffs "cannot meet the second element as they concede the caucus proceeded, votes were cast, the OTT nomination paperwork was submitted, and Plaintiffs' slate appeared on the April 2025 ballot," the Senator misapplies the law. See Dkt. 34 at 9. The second element is objective in nature, meaning a defendant may not simply point to a belief that these plaintiffs were not deterred because they continued to exercise their First Amendment freedoms. *See Brewer v. Town of Eagle*, 553 F. Supp. 3d 636, 649 (E.D. Wis. 2021) (denying defendants' motion for judgment on the pleadings, noting that defendants incorrectly relied on examples showing that plaintiffs were not deterred from engaging in First Amendment activity, and holding that "[d]efendants misstate this standard" and that "[p]laintiffs' actions have no bearing as to whether an ordinary person would have held equally fast").

Numerous allegations in this Complaint reveal how Defendants' conduct would most certainly "deter a person of ordinary firmness from exercising First Amendment activity in the

future[.]" *Bridges*, 557 F.3d at 552; *McDonough*, 743 F. Supp. 2d at 973. Whether Plaintiffs were in fact deterred here is not the question. They went to great lengths to set up a legal caucus in which they sought to assemble, speak, and caucus freely with their fellow citizens—all plainly protected First Amendment activities. Dkt. 1 ¶¶ 23-25; 32-43; *see Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) ("Implicit in the First Amendment freedoms of speech, assembly, and petition is the freedom to gather together to express ideas—the freedom to associate."). Plaintiffs' efforts were met with Defendants' verbal and physical attacks, bolstered by their power as elected officials. Dkt. 1 ¶¶ 60-72 (The Senator's refusal to follow the caucus rules, verbal attacks, physical violence, and invocation of his status to deceive police). Plaintiffs could not even rely on the responding officers to immediately intervene. *Id*. ¶ 73 (police's reluctance to stop the violent mob because of the Senator's power). And finally, Plaintiffs had to continue battling against Defendants' oppressive tactics at the election board. *Id.* ¶¶ 97-107. Taken together, these allegations plausibly show conduct—verbal threats, physical attacks, and manipulation made possible by the invocation of state power—that would deter a person of ordinary firmness from ever holding a similar event in the future. *See Taha*, 947 F.3d at 469; *Bridges*, 557 F.3d at 552; *McDonough*, 743 F. Supp. 2d at 973.

In sum, Plaintiffs "clearly lost the opportunity to interact with voters and spread their political message at a major public event." *TinleySparks, Inc.*, 181 F. Supp. 3d at 557 (describing First Amendment injury to prospective candidates as "plausibly hamper[ing] Plaintiffs' campaigns for local office by making it harder for them to get on the ballot, interact with voters, and show that they had visible support in the community").

The Senator makes a passing argument that Plaintiffs lack standing to make any allegations as to the disenfranchised citizens at the caucus. Dkt. 34 at 9. This is nothing more

than a red herring. *See TinleySparks*, 181 F. Supp. 3d at 558 (rejecting similar standing arguments made by defendants). The 176 paragraphs of allegations certainly include details about citizens who were disenfranchised by Defendants' actions. *See, e.g.,* Dkt. 1 ¶¶ 57, 94. But those allegations serve to paint the broad picture of Defendants' misconduct. Those citizens are not the Plaintiffs in this lawsuit. It is Plaintiffs who allege—in extensive detail—the ways *their* First Amendment rights were trampled on by Defendants. Dkt. 1 ¶¶ 27, 30-35 (OTT was an established political party and Plaintiffs followed the letter of the law in holding the event where they sought to gather together for assembly and speech as part of the election process); *Preston v. Wiegand*, 573 F. Supp. 3d 1299, 1310 (N.D. Ill. 2021) ("[T]he law is settled . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out.") (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

For those reasons, Plaintiffs federal claims are sufficiently pleaded to survive dismissal.

## II.     Plaintiffs Plausibly Allege State Claims Under Illinois Law

Defendants advance several arguments related to Plaintiff's state law claims. For the reasons described above, Plaintiff's federal claims are adequately pleaded, so this Court has supplemental jurisdiction over Plaintiff's state law claims. *See* Dkt. 29 at 11 (arguing simply that because the Court should dismiss Plaintiffs' federal claims, it should relinquish jurisdiction over the state-law claims); 28 U.S.C. § 1367.

The Senator and Township Defendants argue simply that Plaintiffs' election code claims (Counts IV-V) should be dismissed for the same reasons as their federal claims. Dkt. 31 at 10-11; Dkt. 34 at 11. Plaintiffs hereby incorporate their arguments made above in Section I. In addition, Plaintiff's Complaint sufficiently states claims for willful and wanton conduct, as well as and defamation and false light against Senator Hastings.

25

### A.    Plaintiffs Plausibly Allege Willful and Wanton Conduct

Defendants contend that Plaintiffs have not sufficiently pleaded willful and wanton conduct (Count VIII). Dkt. 31 at 11-12; Dkt. 34 at 15.[15] The Senator argues that the Complaint does not plead a duty, causation, or breach, and further implies that an "ultimately successful caucus" does not give rise to a willful and wanton conduct claim. Dkt. 34 at 15. The Township Defendants cite a single paragraph in the Complaint's willful and wanton count as their argument that Plaintiffs have not sufficiently pleaded duty to support a cause of action. Dkt 31 at 12. Just as they have done throughout their motions, Defendants ignore extensive allegations along with the governing pleading standard.

"Illinois recognizes a claim for willful and wanton conduct as a form of aggravated negligence." *Farnik v. Chicago Police Department*, No. 14-c-3899, 2015 WL 13878225 at *3 (N.D. Ill. July 13, 2015). To state a claim for willful and wanton conduct, a plaintiff must plead the elements of a negligence claim: "that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was a proximate cause of the plaintiff's injury." *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. Of Dirs.*, 973 N.E.2d 880, 887 (Ill. 2012). The plaintiff must also allege "either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Id*.

As is described above, Plaintiffs plausibly allege that Defendants' actions were done intentionally and knowingly to abuse their power as elected officials to target Plaintiffs' First Amendment activity, using threats, violence, and concerted exertions of government authority. *See*, *e.g.*, ¶¶ 27, 57, 119, 126; section I. These allegations support a reasonable inference that Defendants acted with either a deliberate intention to harm, or in conscious disregard of,

---

[15] Orland Hills Defendants submit no argument as to Plaintiffs' willful and wanton claim, and as such, this claim should proceed against them. *See Regas*, 2011 WL 332545, at *6; *Sere*, 852 F.2d at 287-88.

Plaintiffs' rights. *Id.*; *Doe-3*, 973 N.E.2d at 887. Accordingly, Plaintiffs have pleaded sufficient facts to bring a claim within a legally cognizable cause of action for aggravated negligence. *See* Dkt. 1 ¶¶ 163-66 (alleging the elements of willful and wanton conduct).

> **B.      Plaintiffs Plausibly Allege False Light and Defamation Against Defendant-Senator Hastings**

Defendant-Senator Hastings attempts to dodge liability for defaming Plaintiff O'Grady to the press by arguing that his statements "are subject to an innocent construction." Dkt. 34 at 13. The Senator's motion also implies that Plaintiffs were trying to deceive the Court by not attaching the Chicago Tribune article for the full context of the offending statements; but his analysis and identifies no such "context" to defeat Plaintiffs' claims at this stage of the litigation, and he continues to ignore the Complaint's allegations. *Id*. at 12-13.

"Defamation is the publication of a false statement that 'tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person.'" *Lott v. Levitt*, 556 F.3d 564, 568 (7th Cir. 2009) (quoting *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006). There are two kinds of defamation claims in Illinois: (1) defamation *per se*, where the statement's "defamatory character is obvious and apparent on its face and injury to the plaintiff's reputation may be presumed[;]" and (2) defamation *per quod*, where injury is not presumed and a plaintiff must plead and prove special damages to recover. *Tuite*, 866 N.E.2d at 121. Statements "words that prejudice a party in her trade, profession, or business" are defamatory *per se*. *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003). "If a defamatory statement does not fall within one of the limited categories of statements that are actionable *per se,* the plaintiff must plead and prove that she sustained actual damage of a pecuniary nature ('special damages') to recover." *Bryson v. News Am. Publications, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996).

False light requires allegations that "(1) the plaintiff was placed in a false light before the public as a result of the defendant's actions; 2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and (3) the defendants acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false." *Garrido v. Arena*, 2013 IL App (1st) 120466, ¶ 29, 993 N.E.2d 488, 50001 (cleaned up). The Senator does not "offer any evidence showing that any of these elements cannot be met" and instead relies on his defamation argument as the basis for defeating the false light claim. *Id.* Because his defamation argument fails, so too does his false light argument.

Plaintiff O'Grady is a proud resident of Orland Township, the elected Supervisor of the Township, and he conducts business in the community. Dkt. 1 ¶ 7.[16] The Complaint alleges that the Senator made *one or more* false statements to the public, in the form of the Senator's interview with the Tribune, that such false statements "imputed that Plaintiff O'Grady was unable to perform or lacked integrity to perform duties as a Supervisor" to support the defamation *per se* claim. *Id*. 1 ¶¶ 108, 149, 153, 156; *Muzikowski*, 322 F.3d at 924. The Complaint lists several defamatory statements referenced in the article, including that it was O'Grady who was circumventing election laws, rather than the Defendants, along with other detailed allegations that reveal the falsity of the Senator's public comments. Dkt. 1 ¶¶ 108. No more is required to survive this stage. *Tuite*, 866 N.E.2d at 121.[17] Such a false statement certainly threatens Plaintiff O'Grady's status as a respected public figure and businessman in the

---

[16] Plaintiff O'Grady is a licensed and practicing attorney who works in the Chicagoland area.

[17] The article itself does not state whether the reporter was present at the event and heard the statements firsthand, whether the reporter conducted separate interviews in addition, or was not present and received all quotes secondhand. Ex. 34-1. Nor are Plaintiffs required to fact-check the article containing the Senator's false statements.

community, whose reputation is critical to his trade, profession, or business. *Muzikowski*, 322 F.3d at 924; *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 207 (Ill. 1992).

In *Bryson v. News Am. Publications, Inc*., the Illinois Supreme Court analyzed the "innocent construction" rule in a way that demonstrates the Senator's improper reliance on it here. 672 N.E.2d at 1217. The *Bryson* court, in rejecting defendants' invocation of innocent construction, stated: "The defendants apparently believe that the innocent construction rule applies whenever a word has more than one dictionary definition, one of which is not defamatory. The innocent construction rule does not apply, however, simply because allegedly defamatory words are 'capable' of an innocent construction." *Id.*

The Senator's argument suffers from the same flaws described in *Bryson*. In contending his statement that O'Grady was "circumventing the election law" is subject to an innocent construction, the Senator points to a dictionary definition of "circumvent," as "to manage to get around especially by ingenuity or stratagem." Dkt. 34 at 14. He also offers a strained analysis of his own words, painting a picture of an innocent observation that Plaintiffs were seeking an alternative way to participate in the election. *Id*. ("A reasonable reader would perceive [Plaintiffs'] actions as, in fact, 'circumventing' or 'managing to get around' the primary-election pathway and pursuing nomination through an alternative mechanism.") Dkt. 34 at 13-14. The Senator is conjuring a meaning that is, at most, merely "capable" of innocent construction, which is not enough to defeat this claim. *Bryson*, 672 N.E.2d at 1217. Most critically, the Senator

29

ignores the clear falsity of his statement, as set forth in the Complaint: he knew the election law allowed Plaintiffs to hold the caucus, and they circumvented nothing. Dkt. 1 ¶¶ 26-29.[18]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss, or, alternatively, grant them leave to amend their Complaint. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519-20 (7th Cir. 2015) (noting that the Seventh Circuit gives "leave to amend freely" and "is 'especially advisable when such permission is sought after the dismissal of the first complaint. Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted'").

Respectfully submitted,

/s Kathryn Montenegro
*One of Plaintiffs' Attorneys*

Michael Kanovitz
Jon Loevy
Kathryn Montenegro
LOEVY & LOEVY
311 N. Aberdeen Street Suite 3
Chicago, Illinois 60607
(312) 243-5900
katie@loevy.com
*Counsel for Plaintiffs*

---

[18] Should the Court decline to presume injury necessary for defamation *per se*, the Complaint sufficiently pleads special damages to support a defamation *per quad* claim, based on allegations that Plaintiff O'Grady suffered financial loss related to Defendants' conspiracy, including legal fees. Dkt. 1 ¶¶ 112-14 (financial damages include tens of thousands of dollars in legal fees); *Tuite*, 866 N.E.2d at 121; *Bryson,* 672 N.E.2d at 1217; *TinleySparks*, 181 F. Supp. 3d at 556 ("At the pleading stage, general factual allegations of injury resulting from [Defendants'] conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

**CERTIFICATE OF SERVICE**

I, Kathryn Montenegro, an attorney, hereby certify that on April 20, 2026, I filed the foregoing motion via the Court's CM/ECF System and thereby served a copy on all counsel of record.


s/ Kathryn Montenegro
One of Plaintiffs' Attorneys